UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **18-CIV-20032-LENARD**
(15-CR-20264-LENARD)

**MIGUEL MORAN DIAZ,**
    **Movant,**

vs.

**UNITED STATES OF AMERICA**
    **Respondent.**
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO VACATE, SET ASIDE, OR CORRECT PURSUANT TO 28 U.S.C. § 2255**

The United States of America, by and through its undersigned Assistant United States Attorney, hereby responds to Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to Title 28, U.S.C., Section 2255, (CV-DE 1)[1] as follows:

**Statement of the Case**

On April 16, 2015, a Southern District of Florida grand jury indicted Miguel Moran Diaz with being a felon in possession of multiple firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1) (CR-DE 7). On May 27, 2015, Diaz pleaded guilty to that charge (CR-DE 33 at 11).

A presentence investigation report ("PSI") was prepared to aid the district court in sentencing Diaz. The PSI explained that, in late January 2015, the Federal Bureau of Investigation ("FBI") began investigating Diaz, who maintained a Facebook page under the name "Azizi Al Hariri" where he posted numerous ISIS-related articles and a photograph of himself with a firearm

---

[1] References to CV-DE refer to civil docket number 18-CIV-20032-LENARD, whereas references to CR-DE refer to the underlying criminal docket, 15-CR-20264-LENARD.

1

(PSI ¶ 3). The PSI elaborated that, in furtherance of that investigation, an FBI confidential source (the "CS") met with Diaz, and, during that meeting, Diaz told the CS that he was a convicted felon who was looking to purchase multiple firearms to add to the two firearms that he already owned (id. ¶¶ 3-4). In the course of describing his firearms, Diaz told the CS that he had a rifle with a collapsible stock that was "perfect because he could fold it up, put it in a backpack, and take it into a stadium undetected" (id. ¶ 5). The PSI next explained that, on January 30, 2015, Diaz told the CS that he was a "lone wolf" for ISIS, that he wanted to acquire another semi-automatic rifle, and that he planned to scratch "ISIS" into the shell casings for the ammunition for that rifle so that, after he killed people, law enforcement would know that ISIS was responsible (id. ¶ 6). The PSI also stated that Diaz had told the CS that a sniper could disrupt a city for weeks until he was caught (id.). The PSI next explained that Diaz had viewed a terrorist-inspired magazine website on January 30, 2015; that Diaz had told the CS that the magazine provided detailed instructions on how to build bombs and was used by the brothers responsible for the Boston Marathon bombing; and that Diaz had showed the CS detailed instructions from the magazine about how to construct a car bomb (id. ¶ 7). Diaz did not object to any of the facts in his PSI (CR-DE 34 at 3).

Based upon the above-described conduct, the PSI determined that Diaz had a base offense level of 22, because he was a convicted felon found in possession of a semiautomatic firearm that was capable of accepting a large capacity magazine (PSI ¶ 17). The PSI then reduced Diaz's base offense level by three, pursuant to USSG § 3E1.1, because he had accepted responsibility, which yielded a total offense level of 19 (id. ¶¶ 24-26). The PSI then detailed Diaz's criminal history, which included a conviction for petit larceny after he was found driving a stolen car, a conviction for carrying a concealed firearm, and a conviction for conspiracy to possess with the intent to distribute cocaine (id. ¶¶ 28-30). When Diaz's total offense level of 19 and his criminal history

category of II were combined, an advisory sentencing guidelines range of 33 to 41 months of imprisonment resulted (id. ¶ 65).  Diaz's statutory maximum sentence was 120 months of imprisonment, pursuant to 18 U.S.C. § 924(a)(2) (id. ¶ 64).

On July 27, 2015, the district court held a sentencing hearing[2] for Diaz (CR-DE 34).  The district court first confirmed with the parties that Diaz had an advisory sentencing guidelines range of 33 to 41 months of imprisonment (id. at 3).  Diaz argued that he should be sentenced to the low-end of that sentencing guidelines range, contending that he had accepted responsibility for his crimes, had a history of employment, and "was mostly compliant" when he was last on federal supervised release for a prior conviction (id. at 4).  The Government recommended a sentence at the high-end of that sentencing guidelines range, stating that Diaz possessed violent beliefs as was evidenced by his Facebook posts regarding ISIS, was actively seeking to purchase additional firearms, had bragged about the fact that his collapsible stock rifle was perfect to smuggled into a stadium undetected, stated that he wanted to be a "lone wolf" for ISIS who killed people using firearm shell casings inscribed with the word "ISIS," was found with a firearm loaded with 15 rounds of ammunition in his waistband and an additional 15 rounds of ammunition in a magazine in his pocket, had a semi-automatic rifle and 297 rounds of ammunition in his residence, and had prior convictions for illegal firearm possession and for conspiring to possess with the intent to deliver over four kilograms of cocaine (id. at 5-8).

The district court explained that, in sentencing Diaz, it would consider only "the factual proffer and the relevant offense conduct as contained in the [PSI], to which there were no objections" (CR-DE 34, Exhibit C at 9).  The district court next stated that "after giving serious consideration to all of the 3553(a) factors, including the advisory guidelines, I find that an upward

---

[2] The sentencing transcript is attached at Exhibit C.

variance to the statutory maximum of 120 months is the appropriate sentence" (id. at 12). The district court then elaborated, at length, as to how the 18 U.S.C. § 3553(a) factors supported the upward variance (id. at 13-23).

First, the district court highlighted the nature and circumstances of Diaz's offense, noting that Diaz maintained a Facebook page under the name of Azizi Al-Hariri that contained numerous postings of ISIS-related articles and a photograph of himself with a firearm; asked the CS to purchase a "baby glock" for him and told the CS that he wanted to purchase several more firearms; told the CS that he had multiple loaded firearms in his possession, including a rifle with a collapsible stock that was a "perfect" firearm because he could bring it into a stadium undetected; told the CS that he was a "lone wolf" for ISIS and planned to scratch ISIS into the shell casings for his bolt-action rifle so that, after killing people, law enforcement would know that he was an ISIS sniper; showed the CS a terrorist-inspired magazine website with detailed instructions on how to build car bombs; told the CS that the Boston Marathon bombers had used that website to learn how to build their bombs; shot firearms with the CS in Everglades National Park; and was found in his vehicle with a loaded firearm and multiple rounds of ammunition on his person (id. at 13-16).

The district court then addressed Diaz's history and characteristics, stating that Diaz's criminal history has spanned 20 years and involved multiple arrests, one of which involved the illegal possession of a firearm and the other of which involved his participation in a cocaine distribution conspiracy (id. at 16-17). Relatedly, the district court examined the need for specific deterrence, stating:

> We have a Defendant who had had several contacts with the criminal justice system. For two of those contacts, he received basically no sentence or very little sentence. And for the conspiracy to possess with intent to distribute cocaine, he received a 46-month sentence.

>And none of those sentences apparently have been sufficient for the Defendant to change his criminal conduct.

(id. at 18). In addition, the district court noted that Diaz had admitted to the CS that he knew that he could not legally possess a firearm because he was a convicted felon but that he still possessed multiple firearms and sought to acquire more (id. at 19).

The district court summarized its conclusions about Diaz, stating that "[t]he offense conduct here establishes that the Defendant was being inspired by ISIS and terrorist activities" based upon Diaz's undisputed statements that he was going to act as a "lone wolf" for ISIS by entering a stadium with his collapsible stock semi-automatic rifle in his backpack and by disrupting the city for weeks by killing people as a sniper using bullets with shell casings engraved with the word ISIS (id. at 18-19). The district court also pointed out that Diaz had conducted online research about terrorist activities and how to construct bombs (id. at 19). The district court explained that "even though the Defendant was prohibited by law to have firearms and ammunitions, he possessed two firearms, at least two firearms and ammunition, and he thought about how he was going to utilize those firearms to kill a lot of people" (id.).

The district court next discussed the need to deter other people considering conduct similar to that of Diaz (id. at 20). In explaining that Diaz's sentence needed to provide adequate general deterrence, the district court read a statement made by the director of the FBI to a Senate Intelligence Committee on July 8, 2015, that "[w]hether or not the individuals are affiliated with a foreign terrorist organization and are willing to travel abroad to fight or are inspired by the call to arms to act in their communities, they potentially pose a significant threat to the safety of the United States and United States persons" and that social media has provided terrorist organizations with the opportunity "to spot and assess potential recruits" to conduct an attack on the United States (id. at 20-21). The district court also read a quote from a statement made by the assistant

5

director of the FBI's counterterrorism division to Congress, which was that ISIS "continues to disseminate their terrorist message to all social media users, regardless of age. Following other groups, [ISIS] has advocated for lone wolf attacks," and then it noted that Diaz had described himself as a "lone wolf" acting on behalf of ISIS (id. at 21). Finally, the district court quoted another statement made by the assistant director of the FBI's counterterrorism division to Congress that the FBI is "concerned about the possibility of homegrown extremists becoming radicalized by information available on the Internet," and it explained that is "[e]xactly what happened here since there was evidence that Diaz had been using the Internet to learn how to build bombs, to share ISIS-related articles, and to share photographs of himself with firearms" (id. at 21-22). The district court concluded "we have a Defendant who . . . consumed this poisonous information and he detailed at least his thought process of how he was going to accomplish this and what he wanted to do while he possessed firearms that he was not allowed to possess as a convicted felon" (id. at 22-23).

The district court concluded:

> I find after considering the individualized, particular facts underlying the offense conduct and the history and characteristics of the Defendant that the combined force of the other 3553(a) factors are entitled to greater weight than the advisory guideline range.
>
> Those include the seriousness of the offense; the need to protect the public; the need to promote respect for the law; the need to afford adequate deterrence of criminal conduct of this Defendant and other persons who may be considering such conduct; his criminal history, including a prior gun charge and a 46-month sentence for conspiracy to possess with intent to distribute cocaine that did not deter the Defendant from further conduct; and the nature and circumstances of the offense.

(id. at 23).

Diaz objected only to the upward variance, stating that he did not believe it was a reasonable application of the 18 U.S.C. § 3553(a) factors (id. at 27). He did not object to the district court's reference to public statements made by the FBI regarding the use of the Internet by terrorist organizations to recruit and instruct new members (id.).

### Statement of the Facts

On April 2, 2015, Diaz, a convicted felon, was found in possession of a .40 caliber Springfield XDM handgun, a .40 caliber Keltec 2000 rifle, and approximately 327 rounds of .40 caliber ammunition (CR-DE 15). That discovery was made when, pursuant to an ongoing terrorism investigation, a search warrant was issued to search Diaz's residence and his car (id.). Pursuant to that search warrant, FBI agents stopped Diaz while he was traveling in his car, removed him from his car, and found the Springfield XDM .40 caliber handgun in his waistband loaded with 15 rounds of ammunition (id.). A further search of Diaz's person revealed that he also had a .40 caliber handgun magazine in his pocket that was loaded with an additional 15 rounds of .40 caliber ammunition (id.). Shortly thereafter, FBI agents searched Diaz's residence, and they found a Keltec 2000 .40 caliber rifle and approximately 297 rounds of .40 caliber ammunition in his bedroom (id.).

Diaz was then taken to the FBI Miami field office, and, once there, he identified both the Springfield handgun and the Keltec rifle as well as all of the ammunition as being owned and possessed by him (CR-DE 15). He stated that he knew that he was prohibited from possessing the firearms and ammunition due to his status as a convicted felon, and he stated that he had purchased the weapons from private individuals to avoid detection (id.).

### MEMORANDUM OF LAW

Movant seeks to vacate his conviction based on the following four claims:

  1.  Defense counsel was inadequately prepared for the Court's *sua sponte* introduction of general concerns regarding terrorism at sentencing;

  2.  Defense counsel was ineffective for failing to object to the District Court's inclusion and consideration of political hearsay;

  3.  The Movant's guilty plea was invalid, since the plea was unknowing, unintelligent, and involuntary;

  4.  Ineffective assistance of defense counsel at sentencing resulted in an increase in the Movant's sentence.

As set forth below, Movant is not entitled to relief on any of these claims.

## **Ineffective Assistance of Counsel**

The standard for reviewing ineffective assistance of counsel claims is found in the two-pronged test of Strickland v. Washington, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders that result unreliable.

Id. at 687. The Supreme Court instructed that courts need not address both prongs "if the defendant makes an insufficient showing on one." Id. at 697; Marek v. Singletary, 62 F.3d 1295, 1298 (11th Cir. 1995). The burden of proof remains on the movant throughout a habeas corpus proceeding. Roberts v. Wainwright, 666 F.2d 517, 519 n.3 (11th Cir. 1982).

With respect to the first prong of the test, the Supreme Court advised that counsel's performance should be evaluated for "reasonableness under prevailing professional norms." Id. at

688.  The Eleventh Circuit has cautioned that a reviewing court "should presume effectiveness and should avoid second-guessing with the benefit of hindsight."  Routly v. Singletary, 33 F.3d 1279, 1287 (11th Cir. 1994), *quoting* Horton v. Zant, 941 F.2d 1449, 1460 (11th Cir. 1991); *see also* Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger).  Moreover, the Eleventh Circuit has recognized that, in view of the rules and presumptions set forth in Strickland, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995), *quoting* Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  This is so because constitutionally acceptable performance is not narrowly defined, but rather encompasses a "wide range".  Id. at 1511.  The Court in Waters clarified the standard of competent assistance as follows:

> The test has nothing to do with what the best lawyers would have done.  Nor is the test even what more good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial ...  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

Id. at 1511-12, *quoting* White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *See also* Sullivan v. Deloach, 459 F.3d 1097, 1108 (11th Cir. 2006) (the purpose of ineffectiveness review is not to grade counsel's performance, but to determine whether that performance fell within the broad range of what might be a reasonable approach to trial).  Effective assistance, therefore, does not necessarily mean errorless assistance, and counsel's record must be judged in light of the entire record rather than specific actions.  Green v. Zant, 738 F.2d 1529, 1536 (11th Cir. 1984).  Clearly, tactical decisions must be accorded broad deference.  Routly v. Singletary, *supra*, 33 F.3d at 1287; Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994).  Consequently, a petitioner seeking to rebut

the strong presumption of effectiveness bears a heavy burden.  Marek v. Singletary, *supra*, 62 F.3d at 1298.

In order to establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, *supra*, 466 U.S. at 694.

Congress enacted § 2255, authorizing convicted criminal defendants to file a motion to correct sentences that violate federal law, with the intention that the statute serve as the primary method of collateral attack on federally-imposed sentences. United States v. Jordan, 915 F.2d 622, 625 (11th Cir. 1990).  Pursuant to § 2255, individuals sentenced by a federal court can attack the sentence imposed by claiming one of four different grounds: "(1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose such sentence; (3) that the sentence was in excess of the maximum authorized by law; and (4) that the sentence is otherwise subject to collateral attack." Hill v. United States, 368 U.S. 424, 426–27, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *see generally* United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952).

"To obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Movant must establish that the facts surrounding his claim present "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." Bowen v. Johnston, 306 U.S. 19, 27, 59 S.Ct. 442, 83 L.Ed. 455 (1939).

This Court may deny § 2255 relief without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C.

10

§ 2255; *see* Long v. United States, 883 F.2d 966, 968 (11th Cir. 1989). As discussed below, movant's § 2255 motion and the record in this case conclusively show that he is entitled to no relief in connection with any of his claims. Thus, no evidentiary hearing is required.

**CLAIM 1 –   Defense counsel was inadequately prepared for sentencing**

In claim 1, the movant claims that the defense was inadequately prepared for sentencing because he failed to prepare for the court's *sua sponte* introduction of statements regarding terrorism and should have done a better job at the sentencing to mitigate his sentence. However, conclusory allegations of ineffective assistance are insufficient. United States v. Lawson, 947 F.2d 849, 853 (7th Cir. 1991). Movant's burden of establishing prejudice is a high one. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Movant cannot meet this burden.

Movant's petition does no more than make the kind of barebones claim which courts have routinely rejected, even where prisoners attach affidavits or produce other evidence. In the instant case, Movant does not attach any affidavits from potential witnesses. He has not indicated the names of witnesses he would have called or what they would have said had they been called to testify. He has listed no evidence he would have presented or how the outcome would have been different had additional evidence or witnesses been presented. Nothing in the record or in his motion supports Movant's claims and none of the issues have merit. In fact, he presents no facts or specificity as to how his attorney's "lack of preparation prevented [him] from making a factual case that militated against the district court's preconceptions regarding the epidemic of terrorist

11

speech." Therefore, the movant has not and cannot meet his burden for relief under *Strickland* or to supply this Court with a basis even for holding a hearing.

Moreover, any claim raised on direct appeal and resolved adversely to the movant should be deemed unreviewable under § 2255 as previously litigated. "As a general rule, § 2255 petitioners may not raise on collateral review a claim previously litigated on direct appeal. Abbamonte v. United States, 160 F.3d 922, 924 (2nd Cir. 1998). Consequently, a § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances…" DuPont v. United States, 76 F.3d 108, 110 (6th Cir. 1996).

In the instant case, the movant filed an appeal with the Eleventh Circuit and specifically claimed that his sentence was unreasonable because the district court violated his due process rights and the Federal Rule of Criminal Procedure 32 by relying on extra-record congressional testimony without notice of its intent to do so.[3] In rejecting the movant's claim, the court specifically held that "[e]ven assuming that the district court's review of extra-record congressional testimony without prior notice constitutes plain error, Diaz's claim fails because it is clear that any such error did not affect his substantial rights as it did not affect the outcome." United States v. Diaz, 15-13608 at 4 (11th Cir. 2016). Accordingly, movant cannot demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, as the appellate court has clearly already stated that any such potential error did not affect his sentence. Consequently, this claim must fail.

### CLAIM 2 – Sentencing counsel failed to object to the district courts inclusion and consideration of untested, non-adversarial (political) hearsay.

In claim 2, the movant complains that sentencing counsel failed to object to the district court's inclusion and consideration of untested, non-adversarial (political) hearsay. As stated

---

[3] United States of America v. Miguel Moran Diaz, 15-13608 (11th Cir. 2016). Opinion attached as Exhibit B.

12

above, any claim raised on direct appeal and resolved adversely to the movant should be deemed unreviewable under § 2255 as previously litigated.  "As a general rule, § 2255 petitioners may not raise on collateral review a claim previously litigated on direct appeal. Abbamonte v. United States, 160 F.3d 922, 924 (2nd Cir. 1998).  Moreover, a § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances…" DuPont v. United States, 76 F.3d 108, 110 (6th Cir. 1996).

In the instant case, the movant filed an appeal with the Eleventh Circuit and specifically claimed that his sentence was unreasonable because the district court violated his due process rights and the Federal Rule of Criminal Procedure 32 by relying on extra-record congressional testimony without notice of its intent to do so.  In rejecting the movant's claim, the court specifically held that "[e]ven assuming that the district court's review of extra-record congressional testimony without prior notice constitutes plain error, Diaz's claim fails because it is clear that any such error did not affect his substantial rights as it did not affect the outcome." United States v. Diaz, 15-13608 at 4 (11th Cir. 2016).  Accordingly, this claim must fail.

### CLAIM 3 – Movant's guilty plea was invalid, since the plea was unknowing, unintelligent, and involuntary.

In claim 3, the movant asserts that his guilty plea was invalid, since the plea was unknowing, unintelligent, and involuntary.  In support of this claim, movant states:

> Mr. Diaz believed that he would receive a 3 level departure that would place him in a 33 to 41 month sentencing range.  He did not fully comprehend that the district court could reject both parties agreement that the Guideline's advisory range was (sic) reasonably.  If he had understood that the district court could ignore mutual recommendations, without any record evidence, he would not have pleaded guilty… if Mr. Diaz had understood the acceptance departure was a mirage, he would not have plead guilty.

*See* § 2255 motion, CV-DE 1, at p. 15, ground three.  Movant states he did not raise this issue on

direct appeal because "the issue was not ripe for review." (id. *at p.7.*). However, it could have been raised on direct appeal, and the movant does not provide any additional reasons that would excuse his default.

This issue is procedurally barred for movant's failure to raise it on direct appeal. In Bousley v. United States, 523 U.S. 614, 118 S.Ct. 1604 (1998), the Supreme Court commented that collateral review of convictions resulting from guilty pleas are necessarily subject to the strictest standards:

> We have strictly limited the circumstances under which a guilty plea may be attacked on collateral review. It is well-settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked. And even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review. Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal. Indeed, the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas.

Id., 523 U.S. at 621; 118 S.Ct. at 1610 (quotes and citations omitted). Accordingly, "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" Id., 523 U.S. at 622; 118 S.Ct. at 1611 (citations omitted).

Movant here has established neither "cause" nor actual "prejudice" resulting from his procedural default. The "cause and prejudice" standard requires movant to show not only that "some objective factor external to the defense" impeded his efforts to raise the issue earlier, Coleman v. Thompson, 501 U.S. 722, 753 (1991), but also that the error he alleges "worked to his *actual* and substantial disadvantage, infecting his entire trial with error." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original). Movant's assertion that his failure to challenge the voluntariness of his guilty plea on direct review was "not ripe for review" clearly cannot

constitute cause under *Coleman*. Moreover, as set forth below, because movant's guilty plea was knowing and voluntary, he cannot establish actual prejudice from his procedural default.

"A guilty plea involves the waiver of a number of a defendant's constitutional rights, and must therefore be made knowingly and voluntarily to satisfy the requirements of due process." United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005). To determine that a guilty plea is knowing and voluntary, a district court must comply with Rule 11, *Fed.R.Crim.P.,* and address its three core concerns: "ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea." Id.; *see also* United States v. Frye, 402 F.3d 1123, 1127 (11th Cir. 2005).

Representations of the defendant, his lawyer and the prosecutor at a plea hearing, as well as any findings made by the judge accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Further, "[s]olemn declarations in open court carry a strong presumption of verity." Id. "There is a strong presumption that statements made under oath during a plea colloquy are truthful." United States v. Medlock, 12 F.3d 185, 187 (11th Cir. 1994). "When a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false." United States v. Rogers, 848 F.2d 166, 168 (11th Cir. 1988), *citing* United States v. Hauring, 790 F.2d 1570, 1571 (11th Cir. 1986). Unless there is evidence in the record which indicates that defense counsel created a false impression as to the plea agreement, a reviewing court must rely on the plea colloquy and signed plea agreement for the proposition that the movant understood the agreement. United States v. Gonzalez-Mercado, 808 F.2d 796, 800 n.10 (11th Cir. 1987).

The record here establishes that movant's guilty plea was in fact knowing and voluntary. As set forth in the Change of Plea transcript (*attached* as Exhibit A), movant's guilty plea

proceeding clearly satisfied the three core concerns under Rule 11; *i.e.*, that the plea was not the result of coercion; that movant understood the nature of the charges against him; and that he understood the consequences of his plea.

Specifically as it relates to the movant's argument, the movant told the Court under oath that he understood:  (1) that the sentencing guidelines will advise the Court in this matter (Ex. A, p. 13); (2) that he and his attorney talked about how the sentencing guidelines might apply to his case (id.); (3) that the Court will consider all of the sentencing factors provided by law, including the sentencing guidelines (id. at 14); (4) ***that after considering all of these factors, the Court will impose a sentence it finds appropriate up to the statutory maximum*** (id.); and moreover, (5) ***that the sentence imposed may be different from any estimate his attorney may have given him.*** (id.) Each time the defendant was asked the above questions, he reaffirmed that he understood.

Additionally, the movant reaffirmed that his plea was being made feely and voluntarily (id.); that he was satisfied with his attorney (id.), that nobody had forced, threatened, or coerced him to plead guilty (id.) and that nobody had made any representations to him to convince him to plead guilty. (id.)

Accordingly, the record affirmatively establishes that movant's guilty plea was knowing and voluntary.  The nature of movant's allegations here does not change that fact.  Indeed, movant's complaint that he would not have plead guilty had he known that his sentence wouldn't effectively be reduced by 3 points for acceptance of responsibility is clearly refuted by the record, where he specifically acknowledged that that after considering the sentencing guidelines and all of the 3553 factors, the Court would impose a sentence that it found appropriate up to the statutory maximum and that the sentence imposed may be different from any estimate his attorney may have given him. (id. at 14).  The movant was in fact afforded a three point reduction for acceptance of

16

responsibility and the guidelines were reduced accordingly. (id. at 3)  However, the Court determined after an extremely thorough analysis of the 3553 factors that an upward variance from the Guidelines was appropriate, and sentenced the defendant to the statutory maximum. (id. at 12). The movant was always aware that this was a possibility, as demonstrated by his response under oath "Yes, ma'am" when asked "do you understand that after considering all of these factors, ***the Court will impose a sentence it finds appropriate up to the statutory maximum"*** (*See* Ex. A at 14, emphasis added). Consequently, this claim is without merit.

### CLAIM 4 –   Ineffective assistance of defense counsel at sentencing resulted in an increase in the Movant's sentence.

In claim 4, the movant once again claims that defense counsel was unprepared for sentencing, and that his failure to object to the hearsay and deficient performance likely increased the movant's sentence.  This claim is similarly without merit, and has previously been addressed above.

A defendant has a constitutional right to effective assistance of counsel at sentencing. *See* Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir.1988). However, the record before the court is sufficient to determine that Diaz was not denied effective assistance of counsel.  As stated previously, as the Eleventh Circuit has already stated, Diaz's claim fails because it is clear that any such error did not affect his substantial rights as it did not affect the outcome." United States v. Diaz, 15-13608 at 4 (11th Cir. 2016).  Accordingly, the movant cannot demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, as the appellate court has clearly already stated that any such potential error did not affect his sentence.   The sentencing transcript reflects that the district court's primary considerations were the 3553(a) factors, specifically the seriousness of the nature and circumstances of Diaz's offense, the need to protect the public and promote respect for the law,

the need to adequately deter Diaz and other considering similar conduct, and Diaz's criminal history.  Id.  Defense counsel presented arguments at sentencing for a low-end recommendation, but it was ultimately rejected by the Court, who was well within its legal authority to vary or depart upward to the statutory maximum.  Moreover, the movant was specifically aware that he could be sentenced up to the statutory maximum.  Defense counsel is not ineffective simply because the Court chose to exercise its discretion and disregard the recommendation of the parties.  Consequently, this claim must fail.

## CONCLUSION

Wherefore, based on the above arguments, the government requests that the Section 2255 motion filed by movant Miguel Moran Diaz be denied in all respects without a hearing.

Respectfully submitted,

**BENJAMIN G. GREENBERG**
UNITED STATES ATTORNEY

By:   /s/ Marc S. Anton_____
      MARC S. ANTON
      Assistant U.S. Attorney
      Florida Bar No. 0148369
      99 N.E. 4th Street, Suite 815
      Miami, Florida 33132
      Tel: (305) 961-9287
      Fax: (305) 536-4675
      Marc.anton@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 15, 2018, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

By:   /s/Marc Anton_____
      Marc S. Anton
      Assistant United States Attorney